# Supreme Court of Texas

═══════════

No. 22-0631

═══════════

The Boeing Company,

*Petitioner*,

v.

Southwest Airlines Pilots Association (SWAPA) on behalf of itself
and its members,

*Respondent*

════════════════════════════

On Petition for Review from the
Court of Appeals for the Fifth District of Texas

════════════════════════════

**Argued March 19, 2025**

JUSTICE BOYD delivered the opinion of the Court, in which Chief Justice Blacklock, Justice Lehrmann, Justice Devine, Justice Busby, Justice Young, and Justice Sullivan joined.

JUSTICE BLAND filed an opinion dissenting in part, in which Justice Huddle joined.

Originally introduced in the mid-1960s, The Boeing Company's 737 model of jetliners has become the best-selling aircraft in aviation

history.[1] In 2011, Boeing introduced its latest variant, the "737 MAX." Boeing presented the MAX as being more fuel-efficient than the previous 737 models but similar enough that pilots could fly it with no additional training. In October 2018 and March 2019, however, two MAXs crashed in Indonesia and Ethiopia, killing all 346 people on the two planes. Both crashes reportedly resulted, at least in part, from a new flight-stabilizing feature[2] on which the pilots had not been trained. After the second crash, the Federal Aviation Administration grounded the MAX.

Not long before the crashes, the Southwest Airlines Pilots Association (SWAPA) agreed on its members' behalf that they would fly MAX aircrafts that Southwest had recently purchased. After the MAX was grounded, SWAPA sued Boeing on behalf of itself and its members, asserting that Boeing interfered with SWAPA's business relationship with Southwest and fraudulently induced the pilots to agree to fly the MAX. Boeing argued that the federal Railway Labor Act preempts the

---

[1] THE BOEING 737 TECHNICAL SITE, *History, Development & Variants of the Boeing 737*, http://www.b737.org.uk/history.htm; *see* Kristen Stephenson, *Boeing celebrates its 10,000th 737 aircraft with a new record*, GUINNESS WORLD RECORDS (Mar. 20, 2018), https://www.guinnessworldrecords.com/news/commercial/2018/3/boeing-celebrates-its-10-000th-737-aircraft-with-a-new-record-518888.

[2] Reportedly, Boeing implemented the Maneuvering Characteristics Augmentation System (MCAS) to account for the 737 MAX's larger engine, which sits more forward on the wing than in earlier 737 variants. *See* Dominic Gates, *Flawed analysis, failed oversight: How Boeing, FAA certified the suspect 737 MAX flight control system*, SEATTLE TIMES (Mar. 17, 2019), https://www.seattletimes.com/business/boeing-aerospace/failed-certification-faa-missed-safety-issues-in-the-737-max-system-implicated-in-the-lion-air-crash/.

claims and, in any event, SWAPA lacks standing to assert the claims on its members' behalf. We conclude that the Act does not preempt the claims and that SWAPA has standing to assert the claims of its members who assigned their claims to SWAPA. We do not address whether those individual claims can or must be joined, consolidated, severed, or set for separate trials, as those issues are not currently before us. We affirm the court of appeals' judgment and remand the case to the trial court.

## I.
## Background

SWAPA is a nonprofit labor organization and employee association that represents roughly 11,000 Southwest pilots and negotiates collective bargaining agreements (CBAs) on their behalf.[3] When Boeing launched the 737 MAX in 2011, Southwest and SWAPA were operating under a CBA they had negotiated and agreed to in 2006. The 2006 CBA listed the types of aircrafts SWAPA pilots would fly, but the list naturally did not explicitly include the yet-to-be-introduced MAX. After Boeing introduced the MAX in 2011, Southwest purchased 150 of the planes, apparently believing the 2006 CBA's list was broad enough to include the new MAX. SWAPA disagreed, and its pilots refused to fly the new planes.

By its terms, the 2006 CBA became "amendable"—that is, "open for further negotiation"—in 2012. *See Atlas Air, Inc. v. Int'l Bhd. of Teamsters*, 943 F.3d 568, 573 (2d Cir. 2019). A CBA "hardly ever expires." *In re Nw. Airlines Corp.*, 483 F.3d 160, 167 (2d Cir. 2007).

---

[3] SWAPA, *About Us*, https://www.swapa.org/about-us/.

3

Instead, once a CBA becomes amendable, the Railway Labor Act requires the parties to renegotiate their agreement and to "maintain the status quo" until they agree to a new CBA. *Id.* (quoting *Consol. Rail Corp. v. Ry. Lab. Execs.' Ass'n*, 491 U.S. 299, 302 (1989)).[4] Southwest and SWAPA opened negotiations when their 2006 CBA became amendable in 2012, but their disputes over whether the status quo under the 2006 CBA required them to fly the MAX and whether the new CBA would require them to fly it dragged on for years, quite publicly.[5]

In 2016, SWAPA sued Southwest in federal court, asserting that the status quo under the 2006 CBA did not require the pilots to fly the MAX.[6] SWAPA alleges that Boeing inserted itself into SWAPA's settlement negotiations with Southwest and falsely assured SWAPA that the MAX was "essentially a more fuel efficient" version of the 737 variant they were then flying and that pilots could fly the MAX without additional training. SWAPA alleges that it relied on Boeing's misrepresentations when it agreed to a new CBA in 2016, which explicitly required the pilots to fly the MAX. After agreeing to the 2016

---

[4] *See generally Detroit & Toledo Shore Line R.R. v. United Transp. Union*, 396 U.S. 142, 152 (1969) (discussing the Act's provisions that form an "integrated, harmonious scheme for preserving the status quo" pending completion of negotiations and resolution of disputes).

[5] *See, e.g.*, Mary Schlangenstein, *Southwest pilots sue carrier to block flying of Boeing's Max*, CHI. TRIBUNE (June 12, 2018), https://www.chicagotribune.com/2016/05/16/southwest-pilots-sue-carrier-to-block-flying-of-boeings-max/ (noting pilots "picketing at airports").

[6] *See* Plaintiffs' First Amended Complaint for Damages & Jury Demand, *Sw. Airlines Pilots Ass'n v. Sw. Airlines Co.*, No. 3:16-cv-01346-O (N.D. Tex. May 19, 2016), ECF No. 6.

CBA, SWAPA dismissed its federal suit against Southwest,[7] and Southwest put its first MAX into service in August 2017. After the crashes in 2018 and 2019 and the subsequent grounding of the MAX, Southwest cancelled hundreds of flights and the SWAPA pilots were left without planes to fly.[8]

SWAPA then filed this suit against Boeing in state court, asserting state-law claims for fraudulent and negligent misrepresentation, tortious interference with SWAPA's contractual rights and business relationship with Southwest, negligence, and fraud by non-disclosure. SWAPA sought damages both on its own behalf (for loss of membership dues and for legal fees) and on behalf of its individual members (for lost wages). Boeing removed the case to federal court, arguing that the Railway Labor Act "completely preempts"[9] SWAPA's

---

[7] *See* Joint Stipulation of Dismissal, *Sw. Airlines Pilots Ass'n v. Sw. Airlines Co.*, No. 3:16-cv-01346-O (N.D. Tex. Nov. 11, 2016), ECF No. 29.

[8] *See* Chris Isidore, *The 737 Max grounding cost Southwest $828 million in 2019*, CNN (Jan. 23, 2020), https://www.cnn.com/2020/01/23/business/ southwest-american-airlines- earnings/.

[9] The "complete preemption" doctrine authorizes removal of a state-law claim from state court to federal court if a federal statute "completely preempts" the state-law claim. *Caterpillar Inc. v. Williams*, 482 U.S. 386, 393 (1987); *see also Horton v. Kan. City S. Ry. Co.*, 692 S.W.3d 112, 124 n.4 (Tex. 2024) ("Under the 'complete preemption doctrine,' a state-law claim arises under federal law and can be removed to federal court if a federal statute wholly displaces the state-law claim." (citing *Beneficial Nat'l Bank v. Anderson*, 539 U.S. 1, 8 (2003))). Complete preemption exists when "the pre-emptive force of a [federal] statute is so 'extraordinary' that it 'converts an ordinary state common-law complaint into one stating a federal claim for purposes of the well-pleaded complaint rule.'" *Caterpillar*, 482 U.S. at 393 (quoting *Metro. Life Ins. Co. v. Taylor*, 481 U.S. 58, 64 (1987)). Although a state-law claim "may *not* be removed to federal court on the basis of a federal

5

state-law claims because the claims require interpretation of the CBAs between Southwest and SWAPA. The federal district court disagreed and remanded the case to state court, holding that, although the resolution of SWAPA's claims "will require interpretation of the CBA," the Act does not wholly displace state-law claims and thus does not support complete preemption. *Sw. Airlines Pilots Ass'n v. Boeing Co.*, 613 F. Supp. 3d 975, 982 (N.D. Tex. 2020).

Back in state court, Boeing filed a plea to the jurisdiction arguing that (1) the Railway Labor Act preempts SWAPA's claims and (2) SWAPA lacks "associational standing"[10] to pursue the claims on the individual pilots' behalf. In response to Boeing's standing challenge, 8,794 of SWAPA's members executed documents assigning their claims against Boeing to SWAPA, and SWAPA filed the assignments with the court. Boeing then amended its plea to argue that the assignments are void as against public policy because they attempt to circumvent Texas law's associational-standing and class-action requirements. The trial

---

defense, including the defense of [ordinary] pre-emption," a claim based on a "completely pre-empted" state law "is considered, from its inception, a federal claim, and therefore arises under federal law" and is removable to federal court. *Id.*

[10] We have held that "an association has standing to sue on behalf of its members when '(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'" *Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 447 (Tex. 1993) (quoting *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)). The Texas Legislature has codified this holding, permitting a "nonprofit association" to "assert a claim in its name on behalf of [its] members" when these elements are met. *See* TEX. BUS. ORGS. CODE § 252.007(b).

6

court granted the plea without explanation and dismissed SWAPA's claims with prejudice.

SWAPA filed a post-judgment motion requesting that the court modify the judgment to dismiss its claims *without* prejudice so it could pursue the same claims in its capacity as assignee of the 8,794 pilots in a separate suit, which it filed in the same trial court.[11] The trial court denied the motion, and SWAPA appealed.

The court of appeals affirmed in part and reversed in part. 704 S.W.3d 832, 845 (Tex. App.—Dallas 2022). It held that (1) the Railway Labor Act does not preempt SWAPA's claims, (2) SWAPA lacks associational standing to pursue the claims on its members' behalf, (3) SWAPA has standing to assert the claims on its own behalf, and (4) the assignments are not void but do not retroactively give SWAPA standing to assert its members' claims in *this* suit.[12] Based on these holdings, the court affirmed the portion of the trial court's judgment that dismissed the claims SWAPA asserted on its members' behalf but modified that portion of the judgment to dismiss those claims *without* prejudice, reversed the portion of the judgment dismissing the claims SWAPA asserted on its own behalf, and remanded the case to the trial

---

[11] After denying SWAPA's motion to modify the judgment in this suit, the trial court dismissed the second suit on res judicata grounds. SWAPA appealed, and the court of appeals reversed, concluding that "SWAPA's petition provides no factual allegations supporting Boeing's res judicata defense." *See Sw. Airlines Pilots Ass'n. v. Boeing Co.*, No. 05-21-00598-CV, 2022 WL 16735379, at *1, *8 (Tex. App.—Dallas Nov. 7, 2022). Boeing filed a petition for review of that judgment in this Court, which we deny today.

[12] *See Tex. Ass'n of Bus.*, 852 S.W.2d at 446 n.9 ("Standing is determined at the time suit is filed in the trial court.").

court. *Id.* at 848–49. Boeing petitioned for review, arguing that the Act preempts SWAPA's claims and that the trial court properly dismissed SWAPA's claims on behalf of the pilots with prejudice because the assignments are void.[13] We granted Boeing's petition for review.[14]

## II.
## Preemption under the Railway Labor Act

Boeing argues that the court of appeals erred by holding that the Railway Labor Act does not preempt SWAPA's state-law claims. We agree with the court of appeals, but for a different reason.

Under the federal Constitution's Supremacy Clause, *see* U.S. CONST. art. VI, cl. 2, federal statutes may expressly or impliedly preempt state laws "and render them ineffective." *Horton*, 692 S.W.3d at 120. "Whether federal law pre-empts a state law establishing a cause of action is a question of congressional intent." *Hawaiian Airlines, Inc. v. Norris*, 512 U.S. 246, 252 (1994). To determine whether a federal statute preempts a state-law claim, we must "focus first on the statutory language, 'which necessarily contains the best evidence of Congress' pre-emptive intent.'" *Dan's City Used Cars, Inc. v. Pelkey*, 569 U.S. 251, 260 (2013) (quoting *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 664 (1993)). Boeing argues that the Railway Labor Act expressly preempts SWAPA's state-law claims because the resolution of those claims requires interpretation of the parties' 2006 and 2016 CBAs. We disagree.

---

[13] Boeing does not appeal the portion of the court of appeals' judgment remanding the case for further proceedings on the claims SWAPA asserts on its own behalf.

[14] We originally denied Boeing's petition for review but later granted it on rehearing.

Congress passed the Railway Labor Act in 1926 "to encourage collective bargaining by railroads and their employees in order to prevent, if possible, wasteful strikes and interruptions of interstate commerce." *Detroit & Toledo*, 396 U.S. at 148. The Act seeks to "promote stability in labor-management relations by providing a comprehensive framework for resolving labor disputes" by, among other things, establishing "a mandatory arbitral mechanism for 'the prompt and orderly settlement'" of both "major" and "minor" disputes[15] between railroad carriers and their employees. *Norris*, 512 U.S. at 252.[16] The Act grants a carrier's employees the right to "organize and bargain

---

[15] "Major" disputes relate to the "formation" of CBAs "or efforts to secure them," while "minor" disputes involve employee grievances and "the interpretation or application of [CBAs]." *Norris*, 512 U.S. at 252–53 (quoting 45 U.S.C. § 151a). In other words, "major disputes seek to create contractual rights, minor disputes to enforce them." *Id.* at 253 (quoting *Consol. Rail Corp.*, 491 U.S. at 302).

[16] *See also Burlington N. R.R. v. Bd. of Maint. of Way Employes*, 481 U.S. 429, 451 (1987) ("[T]he primary goal of the [Railway Labor Act] is to settle strikes and avoid interruptions to commerce."). The Act's express purposes are:

> (1) To avoid any interruption to commerce or to the operation of any carrier engaged therein; (2) to forbid any limitation upon freedom of association among employees or any denial, as a condition of employment or otherwise, of the right of employees to join a labor organization; (3) to provide for the complete independence of carriers and of employees in the matter of self-organization to carry out the purposes of this chapter; (4) to provide for the prompt and orderly settlement of all disputes concerning rates of pay, rules, or working conditions; (5) to provide for the prompt and orderly settlement of all disputes growing out of grievances or out of the interpretation or application of agreements covering rates of pay, rules, or working conditions.

45 U.S.C. § 151a.

collectively" with their employers, 45 U.S.C. § 152 Fourth, but requires that all minor disputes be resolved through arbitration before an "adjustment board," *id.* § 153 First (i).[17] The U.S. Supreme Court has held that, because the Act requires that minor disputes be resolved through arbitration, and because minor disputes are those that involve "the interpretation or application of existing labor agreements," the Act preempts a state-law claim if its resolution "depends on an interpretation of [a] CBA." *Norris*, 512 U.S. at 256, 261.

In this sense, the Supreme Court has construed the Act's preemptive effect to be "virtually identical" to that of the federal Labor Management Relations Act. *See id.* at 260–63 (citing *Lingle v. Norge Div. of Magic Chef, Inc.*, 486 U.S. 399, 413 (1988) (construing the Labor Management Relations Act to preempt claims that require interpretation of a CBA)). Both Acts, the Court has held, preempt state-law claims that require interpretation of a CBA because the "possibility that individual contract terms might have different meanings under state and federal law would inevitably exert a disruptive influence upon both the negotiation and administration of collective agreements." *Loc. 174, Teamsters v. Lucas Flour Co.*, 369 U.S. 95, 103 (1962). The Acts thus preempt such state-law claims to avoid "inconsistent results" in the interpretation of CBAs and thereby promote "uniform" labor-law principles throughout the country. *Lingle*, 486 U.S. at 406; *see Int'l Ass'n of Machinists v. Cent. Airlines, Inc.*, 372 U.S. 682,

---

[17] *See Norris*, 512 U.S. at 253 ("[Minor disputes] must be resolved only through the [Railway Labor Act] mechanisms, including the carrier's internal dispute-resolution processes and an adjustment board established by the employer and the unions.").

691–92 (1963) ("The needs of the subject matter manifestly call for uniformity.").

SWAPA argues, however, that the Railway Labor Act does not preempt its claims because they do not depend on the interpretation of any CBA.[18] We agree. The Act "says nothing about the substantive

---

[18] SWAPA also argues that the Act does not preempt its claims because the Act—including its preemptive provisions—applies only to disputes between a carrier and its employees, not to disputes between a union like SWAPA and a third party like Boeing. The court of appeals agreed with this argument, 704 S.W.3d at 852–53, and the Act's text provides some support for its conclusion. *See* 45 U.S.C. § 181 (stating that the Act's provisions, including the preemption provisions, "are extended to and shall cover *every common carrier by air . . .* and every *. . . person who performs any work as an employee or subordinate official* of such carrier or carriers" (emphases added)); *see also id.* §§ 184 (requiring that all minor "disputes *between an employee or group of employees and a carrier or carriers by air*" be resolved through arbitration by an adjustment board" (emphasis added)), 185 (providing for a "permanent national board of adjustment in order to provide for the prompt and orderly settlement of disputes *between said carriers by air, or any of them, and its or their employees*" (emphasis added))).

But the vast majority of courts that have addressed the issue have concluded that the Act preempts all state-law claims that require interpretation of a CBA between air carriers and their employees, even if the dispute involves only one or neither of them. *See, e.g.*, *Healy v. Metro. Pier & Exposition Auth.*, 804 F.3d 836, 841–42 (7th Cir. 2015) (holding Labor Management Relations Act preempted employees' tortious-interference claims against third party because resolution of the claims required interpretation of the relevant CBA); *Anderson v. Aset Corp.*, 416 F.3d 170, 171–72 (2d Cir. 2005) (same); *Kaufman v. Allied Pilots Ass'n*, 274 F.3d 197, 200 (5th Cir. 2001) (holding Railway Labor Act preempted airline customers' claims against employees' union for damages resulting from "work slowdown" in violation of court order); *Kimbro v. Pepsico, Inc.*, 215 F.3d 723, 727 (7th Cir. 2000) (holding Labor Management Relations Act preempted state-law tortious-interference claims against third parties because claims required interpretation of CBA); *Int'l Union, United Mine Workers of Am. v. Covenant Coal Corp.*, 977 F.2d 895, 896–97 (4th Cir. 1992) (same); *Bhd. Ry. Carmen v. Mo. Pac. R.R.*, 944 F.2d 1422, 1429–30 (8th Cir. 1991) (holding Railway Labor Act preempted union's

11

rights a State may provide to workers when adjudication of those rights does not depend upon the interpretation of [a CBA]." *Lingle*, 486 U.S. at 409. As a result, "not every dispute concerning employment, or tangentially involving a provision of a collective-bargaining agreement, is pre-empted." *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 211 (1985). Under the Supreme Court's precedent, a state-law claim is not preempted if it can be resolved "independent of any negotiated labor agreement," such that the CBA is not the "only source" of the right the claimant asserts. *Norris*, 512 U.S. at 256, 258. Instead, preemption applies only "when resolution of a state-law claim is substantially dependent upon analysis of the terms of" a CBA. *Lueck*, 471 U.S. at 220.

---

tortious-interference claims against third party because resolution required interpretation of CBA); *Baylis v. Marriott Corp.*, 906 F.2d 874, 877 (2d Cir. 1990) (holding Railway Labor Act preempted airline employees' claims against third party for tortious inducement of breach of their CBA because resolution required interpretation of CBA). Relying on these decisions, Boeing contends that the Act preempts all such claims, even if the adjustment boards—which can resolve disputes only between carriers and employees—lack jurisdiction to resolve the claims and, as a result, the claimant is left with no legal remedy at all. *See Kimbro*, 215 F.3d at 726–27 (discussing "remedial gap" that results when Labor Management Relations Act preempts state-law claim and provides no remedy through a federal claim); *Sears v. Newkirk*, No. 2:09-CV-241, 2010 WL 3522578, at *5–6 (N.D. Ind. Sept. 2, 2010) (concluding that a "remedial gap" resulting in the "loss of a remedy" due to preemption under the Railway Labor Act "isn't enough to overcome preemption and dismissal"). This result, Boeing contends, is necessary to eliminate the risk that allowing various state courts to construe the same CBA would cause the very "uncertainty and instability that the [Railway Labor Act] was meant to avoid."

We need not resolve this issue to decide this case, however, because we do not agree that the resolution of SWAPA's state-law claims against Boeing requires interpretation of the parties' CBA.

Boeing argues that the resolution of SWAPA's claims necessarily depends on the meaning of the 2006 and 2016 CBAs. According to Boeing, SWAPA cannot prevail on its claims unless the court determines what the pilots' CBA obligations were and are and particularly whether the 2006 CBA required them to fly the MAX before they explicitly agreed to fly it in the 2016 CBA. We disagree.

To determine whether the resolution of a state-law claim requires interpretation of a CBA, the Supreme Court has considered the proof required to establish the claim's elements. *Lingle*, 486 U.S. at 407. Here, SWAPA asserts claims for fraudulent and negligent misrepresentation[19] and for tortious interference with SWAPA's business relationship with Southwest.[20] SWAPA's overarching complaint is that Boeing made

[19] The elements of a fraudulent misrepresentation claim are (1) a material misrepresentation, (2) which was either known to be false when made or was asserted without knowledge of its truth, (3) which was intended to be acted upon, (4) which was in fact relied upon, and (5) which caused injury. *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 47–48 (Tex. 1998) (citing *Sears, Roebuck & Co. v. Meadows*, 877 S.W.2d 281, 282 (Tex. 1994); *DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 688 (Tex. 1990)). The elements of negligent misrepresentation are (1) a representation made by the defendant in the course of its business or in a transaction in which it has a pecuniary interest that (2) conveyed "false information" for the guidance of others in their business, (3) was made without reasonable care or competence in obtaining or communicating the information, (4) was relied upon by the plaintiff, and (5) caused pecuniary loss. *JPMorgan Chase Bank, N.A. v. Orca Assets G.P.*, 546 S.W.3d 648, 653–54 (Tex. 2018).

[20] Texas law recognizes two types of tortious-interference claims: "one based on interference with an existing contract and one based on interference with a prospective business relationship." *El Paso Healthcare Sys., Ltd. v. Murphy*, 518 S.W.3d 412, 421 (Tex. 2017). SWAPA disavows any claim for tortious interference with the then-existing 2006 CBA and instead asserts only that Boeing tortiously interfered with SWAPA's prospective relationship as detailed in the 2016 CBA. That claim requires proof that (1) there was a

misrepresentations about the MAX with the intent to induce SWAPA and the pilots to agree in the 2016 CBA to fly the MAX. SWAPA does not dispute that it agreed in the 2016 CBA to fly the MAX, and Boeing has identified no other provisions of the 2016 CBA that a court would have to interpret to resolve SWAPA's claims.

Boeing argues, however, that the courts must interpret the 2006 CBA to resolve SWAPA's claims because SWAPA cannot establish that any misrepresentation caused SWAPA to suffer losses if the 2006 CBA already required the pilots to fly the MAX. But SWAPA pilots never flew the MAX under the 2006 CBA. Instead, they steadfastly insisted that the 2006 CBA did not permit Southwest to require them to fly the MAX, and they sued Southwest to enforce that position. More importantly, as noted, the 2006 CBA became amendable in 2012, and the Act required the parties to begin negotiating for a new CBA at that time. SWAPA contends that *regardless* of whether the 2006 CBA required the pilots to fly the MAX, it would not have agreed to fly the MAX *in the 2016 CBA* but for Boeing's misrepresentations. In other words, *even if* the 2006 CBA required the pilots to fly the MAX, SWAPA had no obligation to agree to fly it in the 2016 CBA, and SWAPA asserts that it would not have agreed to fly the MAX in the 2016 CBA but for Boeing's alleged

reasonable probability that SWAPA would have entered into a new CBA with Southwest, (2) Boeing either acted with a conscious desire to prevent the relationship from occurring or knew the interference was certain or substantially certain to occur as a result of the conduct, (3) Boeing's conduct was independently tortious or unlawful, (4) the interference proximately caused SWAPA injury, and (5) SWAPA suffered actual damage or loss as a result. *Coinmach Corp. v. Aspenwood Apartment Corp.*, 417 S.W.3d 909, 923 (Tex. 2013).

14

misrepresentations. In light of these assertions, we conclude that the resolution of SWAPA's claims is not "substantially dependent upon analysis of the terms of" the 2006 CBA. *Lueck*, 471 U.S. at 220. Because the 2006 CBA is not the "only source" of the right SWAPA asserts and SWAPA's claims can be resolved "independent of" that agreement, we conclude that resolution of SWAPA's claims does not require interpretation of the 2006 CBA. *Norris*, 512 U.S. at 256, 258.

We need not and do not decide here whether SWAPA's contentions are true. We explicitly do not decide whether SWAPA can establish that Boeing made misrepresentations or that the alleged misrepresentations in fact induced SWAPA or the pilots to agree in the 2016 CBA to fly the MAX and thereby caused SWAPA and the pilots to incur financial losses. Those are factual issues regarding SWAPA's and its members' mindsets and motives that are yet to be decided. But such "purely factual questions" do not "requir[e] a court to interpret any term of a collective-bargaining agreement." *Lingle*, 486 U.S. at 407. "[E]ven if dispute resolution pursuant to a collective-bargaining agreement, on the one hand, and state law, on the other, would require addressing precisely the same set of facts, as long as the state-law claim can be resolved without interpreting the agreement itself, the claim is 'independent' of the agreement for . . . pre-emption purposes." *Id.* at 409–10.

Boeing notes, however, that the federal court to which it attempted to remove this case has already ruled that SWAPA's claims "require interpretation of the CBA." *See Sw. Airlines Pilots Ass'n*, 613 F. Supp. 3d at 982. We are not bound by this statement. The federal court

15

itself explained—and expressly noted that both parties agreed—that whether it would have to interpret the CBA to resolve SWAPA's claims was irrelevant to its conclusion that it lacked removal jurisdiction under the complete-preemption doctrine. *Id.* at 981. Its decision to remand the case for lack of removal jurisdiction was based on its conclusion that the Railway Labor Act does not "completely preempt" any state law; whether the claims require interpretation of the CBA was wholly irrelevant to that decision. *Id.*

Because the resolution of SWAPA's claims against Boeing is not "substantially dependent" upon an interpretation of either of the parties' CBAs, we conclude that the Railway Labor Act does not preempt SWAPA's claims.

### III.
### Assignments

In its second issue, Boeing argues that the court of appeals erred by modifying the trial court's judgment to dismiss SWAPA's representative claims *without* prejudice.[21] As explained, the court of

---

[21] In a short section of its response brief, SWAPA argues that it has associational standing to assert its members' claims in addition to standing based on the assignments. But SWAPA did not file a petition for review to challenge the court of appeals' judgment affirming the trial court's dismissal of the claims SWAPA asserted on its members' behalf. To the contrary, SWAPA asserted in its response to Boeing's petition for review that the statutory elements for associational standing are irrelevant here because "SWAPA[ is] not suing as a representative" of its members and instead is asserting only "its own claim, along with those of its pilot members as their assignee."

"A party who seeks to alter the court of appeals' judgment must file a petition for review." TEX. R. APP. P. 53.1. SWAPA's argument that it has associational standing is not merely "an alternative basis to support [the court of appeals'] judgment." *Dall./Fort Worth Int'l Airport Bd. v. Vizant Techs.,*

16

appeals held that SWAPA lacks associational standing but concluded that its claims should be dismissed without prejudice because SWAPA has standing to assert the claims of its members who assigned their claims to SWAPA in another lawsuit. 704 S.W.3d at 848. Boeing challenges this aspect of the court's judgment, arguing that the members' assignments are void as against public policy.[22] We disagree.

---

*LLC*, 576 S.W.3d 362, 366 n.9 (Tex. 2019); *see also Ineos USA, LLC v. Elmgren*, 505 S.W.3d 555, 566 n.4 (Tex. 2016) ("[Respondents] may raise their evidentiary arguments (as an alternative to their primary argument . . . ), without filing a cross-petition because they do not seek to 'alter the court of appeals' judgment' on those claims." (citing TEX. R. APP. P. 53.1)). To the contrary, if we agreed that SWAPA had associational standing (an issue we do not reach or decide), we would have to reverse the portion of the court of appeals' judgment affirming the trial court's dismissal of the claims SWAPA asserted on its members' behalf. *See First Bank v. Brumitt*, 519 S.W.3d 95, 112 (Tex. 2017) (holding respondent was required to file cross-petition for review because he sought by his argument "to alter the court's judgment, asking us to reverse the part of the court of appeals' judgment that reversed the trial court's judgment in [respondent's] favor"). Because SWAPA's associational-standing argument seeks to alter the court of appeals' judgment affirming the trial court's dismissal of SWAPA's representative claims, SWAPA waived that argument by failing to file a petition for review.

[22] The assignments read:

. . . SWAPA has agreed to take all actions necessary to recover My Damages from Boeing, including, but not limited to, negotiating with and commencing a civil action against Boeing arising from the MAX Crisis . . . .

[] Damages recovered from Boeing in the Litigation or a settlement will be distributed in an equitable manner in proportion to gross W-2 earnings per pilot . . . .

. . . .

a. I hereby assign and transfer to SWAPA all rights, title, and interest to any and all claims, demands, and/or causes of action

17

Causes of actions are generally assignable unless they violate public policy. *See Henry S. Miller Com. Co. v. Newsom, Terry & Newsom, LLP*, 709 S.W.3d 562, 571 (Tex. 2024) (quoting *State Farm Fire & Cas. Co. v. Gandy*, 925 S.W.2d 696, 707 (Tex. 1996)). We have held that assignments of legal claims that "tend to increase and distort litigation" violate public policy. *Gandy*, 925 S.W.2d at 711. These types of assignments are void, we explained, because they "mislead the jury, promote unethical collusion among nominal adversaries, and create the likelihood that a less culpable defendant will be hit with the full judgment." *Id.* at 705 (quoting *Elbaor v. Smith*, 845 S.W.2d 240, 250 (Tex. 1992)). Boeing urges us to declare that assignments of legal claims by association members to their association also violate public policy when their "sole purpose" is "to circumvent the Legislature's"

---

for My Damages that I have or may have against Boeing arising out of the MAX Crisis.

b. I hereby grant SWAPA the right and authorize SWAPA to take any and all actions to prosecute, settle, and/or compromise any and all claims, demands, and/or causes of action for My Damages that I have or may have against Boeing arising out of the MAX Crisis.

c. I hereby authorize SWAPA to collect, receive, and distribute My Damages from Boeing arising out of the MAX Crisis . . . .

d. I understand that in making this Assignment, I am waiving my right to individually pursue any and all claims, demands, and/or causes of action for My Damages that I have or may have against Boeing arising out of the MAX crisis.

associational-standing requirements as set forth in the Business Organizations Code.[23]

We see no reason to conclude that the pilots' assignments run afoul of public policy. The assignments do not inherently or necessarily make the "litigation more protracted and complex," *id.*, 925 S.W.2d at 715, especially when the alternative could be as many as 10,000 individual lawsuits based on the same facts.[24] The claims and damages that SWAPA seeks are "property-based and remedial," as opposed to the kind of "personal and punitive" claims that are generally unassignable in Texas. *Tex. Med. Res., LLP v. Molina Healthcare of Tex., Inc.*, 659 S.W.3d 424, 439 (Tex. 2023) (holding unfair-settlement claims are unassignable); *see PPG Indus., Inc. v. JMB/Hous. Ctrs. Partners Ltd. P'ship*, 146 S.W.3d 79, 87 (Tex. 2004) (same, for DTPA claims). And SWAPA is in a unique position as the party that actually negotiated the CBA on its members' behalf and allegedly relied on Boeing's misrepresentations. *See Sw. Bell Tel. Co. v. Mktg. on Hold Inc.*, 308

---

[23] Boeing refers to the assignments as "pass-through" assignments, insinuating that there is something untoward about the agreement that SWAPA would not retain a monetary judgment on behalf of its members. No public policy, however, prohibits "passing through" pecuniary awards procured in a lawsuit. *See Sprint Commc'ns Co. v. APCC Servs., Inc.*, 554 U.S. 269, 275–85 (2008) (discussing the history of suits by assignees "when that assignee had promised to give all litigation proceeds back to the assignor" from 17th century English law to present-day American law and holding that such suits are "'amenable to, and resolved by, the judicial process'" (quoting *Vt. Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 777–78 (2000))).

[24] Nor are the SWAPA pilots required to file a class action. *See Citizens Ins. Co. of Am. v. Daccach*, 217 S.W.3d 430, 450 (Tex. 2007) ("[N]othing mandates that a plaintiff pursue a remedy through the procedures of [Texas Rule of Civil Procedure] 42.").

S.W.3d 909, 917–18 (Tex. 2010) (holding that assignments to third party were appropriate, in part, because the third party was not "a 'stranger/entrepreneur'" to the underlying action). We decline to extend our *Gandy* line of cases to conclude that the assignments in this case violate public policy.

But we do not decide today whether and how SWAPA can pursue and try the thousands of individual claims its members assigned to SWAPA. As assignee of the claims, SWAPA has received "the full rights of the" pilot assignors. *Jackson v. Thweatt*, 883 S.W.2d 171, 174 (Tex. 1994). SWAPA "steps into the shoes of the [pilots] and is considered under the law to have suffered the same injury as the [pilots] and have the same ability to pursue the claims." *Sw. Bell*, 308 S.W.3d at 916. But to prevail on any individual pilot's claim, SWAPA must establish that the pilot suffered an "injury in fact" as a result of Boeing's alleged wrongful conduct. *Vt. Agency of Nat. Res.*, 529 U.S. at 773. An assignment of a legal claim does not relieve the assignee from the burden of proving what the assignor would have to prove to recover on the claim because the assignee acquires no greater rights than his assignor had. *See York's Adm'r v. McNutt*, 16 Tex. 13, 17 (1856). The assignee of a claim "owns [the claim], controls its prosecution, and is entitled to any recovery," *Henry S. Miller*, 709 S.W.3d at 572, but may only prevail by proving the defendant's liability to the assignor and the damages the assignor sustained. To recover damages on a pilot's claim for tortious interference or misrepresentations, for example, SWAPA must establish that each individual pilot relied on alleged

20

misrepresentations and suffered a particular amount of damages as a result. *See supr*a notes 19–20.

This requirement that SWAPA establish each assigning pilot's claim, however, is simply inherent in the nature of an assignment; it does not provide a basis on which we should declare the assignments void as against public policy under the *Gandy* line of cases. The Legislature has directed that SWAPA cannot have associational standing to sue on behalf of its members if the claim or relief requires the individual members' participation in the suit, *see* TEX. BUS. ORGS. CODE § 252.007(b), but it has not imposed the same prohibition against a member's assignment of his claim to an association, although it certainly could have done so, *see Sw. Bell*, 308 S.W.3d at 915–16 (upholding assignments when anti-assignments clause could have but did not prohibit specific assignments at issue).

Nor do we agree that the assignments are void because they permit SWAPA to "circumvent" the requirements for associational standing or class actions. *See post* at 3 (BLAND, J., dissenting). Associational standing, class-action standing, and standing based on an assignment provide alternative means for obtaining standing, *see Warth v. Seldin*, 422 U.S. 490, 515 (1975), and, because of their distinct requirements, neither circumvents the other, *see Sw. Bell*, 308 S.W.3d at 918 (noting that issues relate to claimant's "adequacy as the class representative, . . . not the validity of the assignments it holds").

Because SWAPA has waived any assertion of associational standing and has not sought class certification, it must individually establish each of its assigning members' claims, which presents

21

challenges for how they may be tried and resolved. Several of our procedural rules permit and govern the joinder, consolidation, severance, and separate trials of both claims and parties, as necessary to promote the efficient and just resolution of legal disputes.[25] These procedural options exist so that trial courts can "avoid prejudice, do justice, and increase convenience" when resolving the claims that come before them. *Sealy Emergency Room, L.L.C. v. Free Standing Emergency Room Managers of Am., L.L.C.*, 685 S.W.3d 816, 822 (Tex. 2024) (citing *F.F.P. Operating Partners, L.P. v. Duenez*, 237 S.W.3d 680, 693 (Tex. 2007)).[26] "Procedural matters, such as joinder and the consolidation of claims, are left to the discretion of the trial court, whose rulings will not be overturned absent an abuse of discretion." *Bennett v. Grant*, 525 S.W.3d 642, 653 (Tex. 2017).[27] "But the court is not vested with

---

[25] *See, e.g.*, TEX. R. CIV. P. 39 (addressing joinder of necessary and indispensable parties), 40 (addressing permissive joinder of parties and separate trials to "prevent a party from being embarrassed, delayed, or put to expense"), 41 (addressing consolidation and severance of claims "on such terms as are just"), 174 (addressing consolidation "to avoid unnecessary costs or delays" and separate trials "in furtherance of convenience or to avoid prejudice").

[26] *See Long v. Castle Tex. Prod. Ltd. P'ship*, 426 S.W.3d 73, 82 n.15 (Tex. 2014) ("Avoiding prejudice, doing justice, and increasing convenience are the controlling reasons to sever."); *In re State*, 355 S.W.3d 611, 613 (Tex. 2011) ("Courts permit severance principally to avoid prejudice, do justice, and increase convenience."); *In re Ethyl Corp.*, 975 S.W.2d 606, 610 (Tex. 1998) ("The express purpose of Rule 174(b) was to further convenience, to avoid prejudice, and to promote the ends of justice.").

[27] *See Sealy*, 685 S.W.3d at 822 ("When a severance order is challenged, an appellate court reviews it for abuse of discretion."); *F.F.P. Operating Partners*, 237 S.W.3d at 693 ("We will not reverse a trial court's order severing a claim unless the trial court abused its discretion."); *Womack v. Berry*, 291

unlimited discretion, and is required to exercise a sound and legal discretion within limits created by the circumstances of the particular case." *Womack*, 291 S.W.2d at 683.

As explained, the claims SWAPA asserts based on its members' assignments are currently pending not in this suit but in a second suit that SWAPA filed after Boeing challenged SWAPA's associational standing. *See supra* note 11. Whether those claims may or must be joined, consolidated, severed, or set for separate trials is not before us today. In determining how to resolve those claims, the trial court must consider prejudice, justice, and convenience in accordance with the rules' requirements and must ensure that SWAPA pursues the claims as an assignee and not as a representative association. Although generally "[t]he assignee of a claim owns it, controls its prosecution, and is entitled to any recovery," *Henry S. Miller*, 709 S.W.3d at 572, SWAPA may only prevail on an assigned claim by proving Boeing's liability to the individual member who assigned it and the damages that member sustained. In short, SWAPA may not rely on the assignments as a means to circumvent the statutory and procedural requirements for associational standing.

Today, however, we hold only that the assignments are not void as against public policy and thus give SWAPA standing to pursue its assigning members' individual claims. We therefore conclude that the court of appeals did not abuse its discretion by modifying the trial court's

S.W.2d 677, 682 (Tex. 1956) ("The Rules of Civil Procedure bestow upon trial courts broad discretion in the matter of consolidation and severance of causes, and the trial court's action in such procedural matters will not be disturbed on appeal except for abuse of discretion.").

judgment to dismiss the claims SWAPA asserted on its members' behalf without prejudice.

## IV.
## Conclusion

We conclude that the Railway Labor Act does not preempt SWAPA's claims because the resolution of those claims does not substantially depend upon interpretation of the parties' CBA. We also conclude that the court of appeals did not abuse its discretion by dismissing SWAPA's representative claims without prejudice because SWAPA's members' assignments of their claims to SWAPA are not void as against public policy and gave SWAPA standing to pursue those claims as assignee. And Boeing does not challenge the court of appeals' holding that SWAPA has standing to pursue its claims on its own behalf. We thus affirm the court of appeals' judgment remanding the case to the trial court for further proceedings on the claims SWAPA asserts on its own behalf.

Jeffrey S. Boyd
Justice

**OPINION DELIVERED:** June 20, 2025